IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

Karen PRESCOTT and William PRESCOTT,

Plaintiff,

v.                                             Civil Action No. 4:12cv126

Joy WADE and Kimberly Irvine,

Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendants Joy Wade ("Wade") and Kimberly Irvine's

("Irvine") (collectively, "Defendants") Motion for Summary Judgment ("Motion"). On March 6,

2013, the Court convened a hearing and ruled from the bench. The Court GRANTED

Defendants' Motion and now issues this Opinion and Order setting forth the reasons for its ruling

in further detail.

## I.    PROCEDURAL HISTORY

Plaintiffs filed their Complaint in the York County Circuit Court on August 3, 2011.

Doc. 1. The Complaint charges Defendants with defamation, malicious prosecution, and

violation of Plaintiffs' rights under the Eighth, Fifth, and Fourteenth Amendments to the United

States Constitution. Id. Defendants received the Complaint and Summons on July 13, 2012. Id.

On August 3, 2012, Defendants filed an Answer denying the allegations raised in the Complaint

and demurred as to the defamation action. Id. On August 8, 2012, Defendants removed the

action to federal court, pursuant to 28 U.S.C. §§ 1441 and 1446. Doc. 1. The parties stipulated

to dismissal of the defamation claim with prejudice on September 6, 2012. Doc. 4.

Defendants filed the instant Motion and supporting memorandum on February 6, 2013. Doc. 6. Plaintiffs' Response in Opposition to the Motion for Summary Judgment ("Response") and supporting memorandum was filed on February 21, 2013. Doc. 11.[1] Defendants' Rebuttal Brief in Support of Motion for Summary Judgment ("Rebuttal") was filed on February 26, 2013. Accordingly, the instant Motion is ready for review.

## II.    FACTUAL HISTORY[2]

### A. The Incident

On June 7, 2009, the Prescotts' fourteen (14) month old daughter, K.P.[3], suffered a second-degree burn to her left leg when she slipped from an All-Terrain Vehicle ("ATV") upon which she was riding with her father, Mr. Prescott, and her twin sister. Doc. 7 at 1.

Mr. Prescott drove the single-seat ATV with K.P.'s sister placed between his legs, in front of him, and K.P. seated directly in front of her sister. Doc. 7 at 2; see also Mr. Prescott Dep. 16:16-18:4, Doc. 7, Ex. 1 (hereinafter "Mr. Prescott Dep."). K.P. wore shorts and a tank top, and neither child wore a helmet or was secured by any safety restraint. See Mrs. Prescott Dep. 12:41-18, Doc. 7, Ex. 2 (hereinafter "Mrs. Prescott Dep.) Mr. Prescott drove the ATV slowly around the Prescotts' yard, using his right hand to steer, and his left arm to hold his

---

[1] Plaintiffs' opposition to the motion for summary judgment does not adhere to the requirement set forth in Local Rule 56(B):

> A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute.

E.D. Va. L. Civ. R. 56(B).

[2] The following factual statement relies largely on Defendants' statement of undisputed facts, as Plaintiffs did not include a statement of disputed facts as required by Local Rule 56(B). The consequence of such an omission is that all facts identified by Defendants are assumed admitted by the court. E.D. Va. L. Civ. R. 56(B) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."). Despite this defect, the Court will reference some of the factual disputes identified by Plaintiffs in their Response, in part to demonstrate that such "disputes" were not material, but also to provide as complete an analysis of the parties' arguments as possible.

[3] Initials are used to protect the identity of minors.

2

daughters. Doc. 7 at 2. At some point, K.P. slipped to the left side of the ATV (where the exposed engine compartment was located) and screamed loudly. Id.; see also Decl. of Sgt. Kelly Waddell, Ex. B (Doc. 7, Ex. 5) (including photos of the ATV). After running over to attend to her daughter, Mrs. Prescott discovered that a flap of skin had pulled away from K.P.'s left leg. Mrs. Prescott Dep. 23:12-18; Mr. Prescott Dep. 38:11-20; 39:8-10. Mrs. Prescott took K.P. inside, rinsed her wound with cool water, applied triple antibiotic ointment to the wound, dressed her in long pants, and gave her some Tylenol. Mrs. Prescott Dep. 15:4-22. K.P. received no further treatment that night.

The afternoon of June 8, 2009, K.P. woke from a nap feeling a little warm. Mrs. Prescott Dep. 23:16-17. Because Mrs. Prescott was concerned that K.P. might have a fever, the Prescotts decided to take her to the doctor. Id. at 27:16-22. K.P. was taken to Langley Air Force Base ("LAFB") Urgent Care because her pediatrician was unavailable. Id. at 28:19-29:21.

K.P. was diagnosed with a deep second-degree burn on her left shin. See Doc. 7, Ex. 3 (LAFB Urgent Care Center Physician Record). Her treating physician, Dr. Koertner, was so troubled by K.P's injury that he felt that child protective services ("CPS") needed to be contacted. Id. K.P. was also referred to Dr. Inciong at Aesthetic Plastic Surgery ("APS") for specialized burn care. Id. On June 9, 2009, K.P. was seen by Dr. Rosenblum at APS, who confirmed Dr. Koertner's diagnosis. See Doc. 7, Ex. 4 at 33 (Dr. Inciong's office note).

**B. The Investigation**

On June 8, 2009, an individual from LAFB contacted CPS (and the Poquoson Police Department) to report K.P.'s injury and their suspicions of child neglect. Declaration of Joy Wade at ¶ 2-3, Doc. 7, Ex. 7 (hereinafter "Wade Decl."). Wade, a social work investigator for York/Poquoson Social Services' ("YPSS") CPS division, was assigned to investigate the

3

incident. Id. Wade reviewed medical records from LAFB Urgent Care, and reached out to the

Prescotts, eventually scheduling an in-home meeting for June 19, 2009. Id. at ¶ 6-7.

The events occurring at the June 19, 2009 meeting and their impact on Wade's risk

assessment and subsequent neglect determination appear to be the only facts in dispute.[4] At the

initial home visit, Wade interviewed the Prescotts about the circumstances of K.P.'s injury and

subsequent medical treatment. Id. at ¶ 8. The Prescotts relayed information that was consistent

with Wade's understanding of the facts from reviewing the LAFB medical records. See,

generally, Social Services Narrative Report of Recording of the Initial Visit, Doc. 11, Ex. 5

(hereinafter "YPSS Report"); Wade Decl. at ¶¶ 3-6. Specifically, the Prescotts readily admitted

how K.P. was injured, and the fact that she was not taken to the hospital until the following day.

YPSS Report at bates stamp P-035-P-036.

### i.   *First Aid Training*

The Parties have different recollections of the portion of the initial visit when the

Prescotts discuss their first aid training and qualifications. Plaintiffs assert that they first

informed Wade of their prior first-aid training, including the fact that Mr. Prescott had

documentation of his qualifications available for inspection, at the initial home visit. Doc. 11 at

2; see also Affidavit of Karen Prescott, Doc. 7, Ex. 3 (hereinafter "Mrs. Prescott Aff.").[5] The

---

[4] Please note, however, that because Plaintiffs' response does not include the required statement of disputed facts, it is difficult to tell precisely which facts are in dispute. Moreover, Plaintiffs' Response is riddled with typographical errors that make it difficult to ascertain Plaintiffs' factual assertions, and their consistency with the cited record. There were several inconsistencies in Plaintiffs' version of the facts, which the Court was loath to resolve, as doing so seemed to be an exercise in weighing the credibility of the evidence, rather than ascertaining the presence of a material factual dispute. At any rate, as will be explained in further detail, the Court does not believe that the facts detailed above were in dispute, and if so, that such dispute was material to the issues raised in the instant Motion.

[5] Plaintiffs expand on this allegation in their due process argument, where they assert that Mr. Prescott showed written proof of his first aid qualifications to Wade during the initial home visit. Doc. 11 at 3. Plaintiffs cite to Mrs. Prescott's Affidavit to support this allegation, however, review of the language used in the Affidavit does not clearly support the conclusion the assertion that Mr. Prescott showed his written documentation to Wade. See Doc. 11, Ex. 4 ("My husband even had written documentation of his qualifications."). Even when taking the evidence in the light most favorable to Plaintiffs, notwithstanding the defects in their Response, the cited evidence does not

Plaintiffs' statement that they verbally informed Wade of their first-aid qualifications is consistent with the YPSS Report, which is essentially a transcript of the recording of that meeting. See YPSS Report at bates stamp P-035. In its statement of undisputed facts, however, Defendants' allege that YPSS was first provided with evidence that Mr. Prescott may have had some first-aid training including some knowledge burn care, on January 5, 2010, at the local conference. Doc. 7 at 7.

After interviewing the Prescotts individually, Wade visually examined K.P.'s injury and observed K.P. and her siblings. Wade Decl. at ¶8. Also, at Wade's behest, the Prescotts executed a safety plan, in which the Prescotts agreed to: (1) take appropriate precautions (adult supervision and use of safety gear) when allowing the children on any equipment; and (2) seek medical treatment for their children immediately following any injury that is questionable due to the child's age. Wade Decl. at ¶ 8; id. Ex. B.

The YPSS investigation continued after the initial home visit. Wade's efforts included gathering K.P.'s medical records from LAFB and APS, which delayed the investigation, forcing Wade to seek an extension. Wade Decl. at ¶¶ 9-13. On July 2, 2009, pursuant to a Memorandum of Understanding ("MOU") between YPSS and local law enforcement, Wade shared information regarding the YPSS investigation with Navy Family Advocacy. Doc. 7 at 6; see also Declaration of Kimberly Irvine at ¶ 3, Doc. 7, Ex. 8 (hereinafter "Irvine Decl."). Wade also conducted a follow-up home visit on July 8, 2009. Doc. 7 at 6. Additionally, Wade requested consultation expert opinion on K.P.'s injuries from Dr. Suzanne Starling, Medical Director of the Child Abuse Program at the Children's Hospital of the King's Daughters in

support the statement that documentation of Mr. Prescott's first-aid qualifications was presented to Wade in the initial home visit. Moreover, this statement is inconsistent with Defendants' statement of undisputed facts, which has been admitted as the factual record in this case. See Doc. 7 at 7; see also Irvine Decl. at ¶ 3 ("William Prescott also provided for the first time some documentation indicating that he had received some first aid training and may have had some knowledge with respect to burn care.").

Norfolk, Virginia. Doc. 7 at 6; see also Wade Decl. at ¶ 14. Wade provided Dr. Starling with

K.P.'s urgent care medical records and two office notes from K.P.'s plastic surgeons, Drs.

Inciong and Rosenblum. Wade Decl. at ¶ 14. Wade also relayed the details of her investigation

of the Prescotts. Id. After reviewing this information, Dr. Starling concluded that K.P. had

suffered a severe injury, and that the manner in which she was injured, coupled with the 24-hour

delay in seeking medical care showed a "significant lapse in parental judgment [constituting]

neglect." Forensic Pediatric Consultation at 3, Doc. 7, Ex. 9 (hereinafter "Starling Report"). Dr.

Starling specifically noted that the initial care to K.P.'s injury (cleansing and application of

ointment) "was not appropriate burn care" for a burn as severe as K.P.'s injury. Id.

> ### ii. *Review and Determination*

After completing the investigation, Wade convened a team of at least six social workers

to discuss and review the evidence. Wade Decl. at ¶ 15. Ultimately, Wade found that the

Prescotts had committed Level Two (2) Medical Neglect, and that Mr. Prescott had committed

Level Two (2) Physical Neglect (Lack of Supervision). Id.; see also Irvine Decl. at ¶ 7. On,

August 5, 2009, Wade informed the Prescotts of her findings. Id.

## C. The Appeals

The Prescotts submitted a written request for amendment of Wade's determination of

neglect to YPSS. Irvine Decl. at ¶ 5. On January 5, 2010, an informal conference (the "local

conference") was convened, with Irvine, Director of YPSS, presiding. Id. Irvine heard evidence

from Wade's investigation, assessment and report. Id. at 6. Irvine also considered evidence

presented by the Prescotts, including: (1) a letter from K.P.'s pediatrician that indicated that the

manner in which the Prescotts attended to K.P.'s wounds was appropriate; and (2) the first

documentation that YPSS had received from Mr. Prescott that indicated that he had received first

aid training and may have had knowledge of burn care. Id. Irvine decided that there was

sufficient new evidence to warrant overturning the medical neglect determination, but upheld the

physical neglect finding against Mr. Prescott. Id. Irvine's findings were communicated to the

Prescotts in a writing dated January 7, 2010. See Irvine Decl. at ¶ 7; see also id., Ex. D. Mr.

Prescott requested an administrative hearing on the state level. Irvine Decl. at ¶ 8. The finding

of Level Two (2) Physical Neglect against Mr. Prescott was overturned after a hearing held on

April 1, 2010. Id.

**D. The Impact of the YPSS Investigation on the Prescotts**

In the statement of facts section of the Response, the Prescotts generally allege that the

various investigations into child neglect negatively impacted their reputations, career trajectories,

and fiscal health. Doc. 11 at 6. However, Plaintiffs later argue that Wade's investigation caused

Mr. Prescott to be removed from an executive officer position on a submarine tender, forcing his

unplanned retirement from the Navy and the family's relocation to Florida. Doc. 11 at 6; see

also Mr. Prescott Dep. 83-87, Doc. 11, Ex. 2.[6]

### III.     LEGAL STANDARDS

Summary judgment under Rule 56 is appropriate only when the court, viewing the record

as a whole and in the light most favorable to the nonmoving party, determines that there exists no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions v. Burlington Indus., 763 F.2d

604, 610 (4th Cir. 1985). Once a party has properly filed evidence supporting the motion for

summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings,

---

[6] Plaintiffs' allegations are inconsistent with the viewable portion of their cited record. However, Plaintiffs' cited record, included as exhibit 2 to the Response is incomplete, because of what appears to be a formatting error. As a consequence of an apparent formatting error, lines 22-25 of each of pages 83-87 is omitted.

but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322-24. Such facts must be presented in the form of exhibits and sworn affidavits. Failure by plaintiff to rebut defendants' motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Although the court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995)(citing Celotex, 477 U.S. at 324).

## IV. **DISCUSSION**

In support of its Motion for Summary Judgment, Defendants assert the following: (1) Plaintiffs' federal claims are unsupported by evidence and barred by the doctrine of qualified immunity; and (2) Plaintiffs' state law malicious prosecution claim is unsupported by evidence and barred by the doctrine of good faith immunity. Within each of these general categories, Defendants attempt to identify the precise nature of Plaintiffs' claims and dispute their validity.

### A. **Plaintiffs' Federal Claims**

In the Complaint, Plaintiffs "seek money damages for violations of their rights, privileges and immunities secured under the Eighty [sic], Fifth, and Fourteenth Amendments to the United

States Constitution and by 42 U.S.C. § 1983." Complaint at ¶2, Doc. 7, Ex. 10 (hereinafter "Compl."). Defendants argue that Plaintiffs' constitutional claims are both unsupported by evidence and barred by the doctrine of qualified immunity. Because qualified immunity analysis requires determining whether the facts alleged support finding a constitutional violation, see Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), the possible constitutional violations associated with Plaintiffs' claims are discussed first, and incorporated by reference into later discussion of Defendants' entitlement to qualified immunity.

### i. *Plaintiffs' Eighth Amendment Claim*

The Eighth Amendment provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

Defendants contend that the Prescotts raise no factual allegations in the Complaint supporting an Eight Amendment violation, as any criminal charges raised against the Prescotts for failing to secure medical attention for an injured child were ultimately dismissed. Doc. 7 at 9-10. Plaintiffs concede that they have no Eighth Amendment claim. Doc. 11 at 2.[7] Because Plaintiffs have alleged no facts supporting an Eighth Amendment claim, the Court **GRANTS** Defendants' Motion for Summary Judgment on this ground.

### ii. *Due Process Claims*

Next, Defendants address Plaintiffs' contention that their rights to due process, as established in the Fifth and Fourteenth Amendments, were violated. Defendants presume that the Prescotts are contending that Wade and Irvine's actions violated their liberty interest in familial privacy and integrity. Doc. 7 at 12. The United States Supreme Court has restricted the concept of familial privacy to "(1) thwarting governmental attempts to interfere with particularly

---

[7] Plaintiffs' Response included no pagination; accordingly, this memorandum adopts the page number provided by CM/ECF.

intimate family decisions, and (2) voiding government actions that sever, alter, or otherwise affect the parent/child relationship." Hodge v. Jones, 31 F.3d 157, 163 (4th Cir. 1994); see Santosky v. Kramer, 455 U.S. 745, 753, (1982) (addressing the termination of parental rights); see also Moore v. City of East Cleveland, 431 U.S. 494, 503, (1977) (addressing family living arrangements). While the sanctity of the family unit is a "fundamental precept firmly ensconced in the Constitution and shielded by Due Process," the right is "neither absolute nor unqualified," and may be outweighed by a legitimate governmental interest. Moore, 431 U.S. at 499-500; see also Martin v. Saint Mary's Dept. Soc. Services, 346 F.3d 502, 506 (4th Cir. 2003); Hodge, 31 F.3d at 163. The Fourth Circuit has held that a state has a legitimate interest in curtailing the abuse and neglect of its minors. See Renn By & Through Renn v. Garrison, 100 F.3d 344, 349 (4th Cir. 1996); Hodge, 31 F.3d at 164.

Because Plaintiffs did not specify the nature of their due process claims, Defendants' Motion addresses potential violations of both procedural and substantive due process.

### 1. Procedural Due Process

Defendants argue that summary judgment is appropriate because the Prescotts' procedural due process rights were not violated. "Procedural due process provides merely 'a guarantee of fair procedures – typically notice and an opportunity to be heard.'" Wolf v. Fauquier County Bd. of Supervisors, 555 F.3d 311, 323 (4th Cir. 2009) (citing Mora v. City of Gaithersburg, 519 F.3d 216, 230 (4th Cir. 2008)); see also Zinermon v. Burch, 494 U.S. 113, 125 (1990); Goss v. Lopez, 419 U.S. 565, 579 (1975) ("'there can be no doubt that at a minimum they require that deprivation of life, liberty or property . . . be preceded by notice and opportunity for hearing appropriate to the nature of the case.'")(alteration in original).

In Wolf, the plaintiff brought a § 1983 action against employees of the Fauquier County Department of Social Services ("DSS") for an investigation she claims violated her right to procedural due process. DSS employees investigated Wolf after her life coach filed a report indicating that plaintiff planned to harm herself and her children. Id. at 314-15. The investigation was ultimately resolved in plaintiff's favor. Id. at 317. Plaintiff alleged that DSS employees made false allegations against her, rejected her attempts to explain that reports against her were false, refused to investigate the lack of mental health qualifications of plaintiff's life coach, and insisted that she accept DSS services. Id. at 322. In making her case, the plaintiff identified a number of ways that she believed the claims of abuse could have been more quickly resolved. Id. While the court found it "regrettable" that Wolf had to address an "undeniably intrusive inquiry," it found that the inquiry, "even if imperfect," did not violate due process, because Wolf was not denied the right to make her case. Id. at 323.

Defendants contend that Wade's investigation and determination, and Irvine's review of the initial findings were consistent with the requirements of procedural due process, entitling Defendants to summary judgment as a matter of law. Doc.7 at 10. In support of this argument, Defendants point to the factual record, noting that the Prescotts fully participated in Wade's investigation of allegations of neglect. Wade Decl. at ¶¶ 8, 12-13 (Doc. 7, Ex.7) (describing Wade's two visits to the Prescotts' home). Moreover, after Wade's finding of neglect, the Prescotts exercised their legal right to seek to amend the determination. Irvine Decl. at ¶ 5; see also Va. Code Ann. § 63.2-1526(A) (setting forth the process of seeking an amendment to a determination of abuse or neglect). On January 5, 2010, Plaintiffs' appeal was heard by Irvine, who presided over the YPSS informal conference, as required by Section 63.2-1526(A) of the Virginia Code. Id. After considering the evidence initially compiled by Wade, as well as new

evidence offered by the Prescotts, Irvine overturned the medical neglect findings. Id. at ¶ 7.

Later, Mr. Prescott successfully appealed the physical neglect finding on the state level. Mr.

Prescott Dep. 74:6-24 (Doc. 7, Ex. 1). In Defendants' view, the Prescotts were given notice and

ample opportunity to be heard, consistent with the requirements of procedural due process.

Plaintiffs do not argue that they were denied an opportunity to be heard, rather, they

assert that their opportunity to be heard at the local conference was rendered meaningless by

Wade's report and assessments, which omitted exculpatory evidence. Doc. 11 at 3. Specifically,

Plaintiffs allege that: (1) Wade failed to consider evidence that the Prescotts received first aid

training through their military service, and failed to communicate that information to Dr.

Starling, whom Wade consulted to provide an expert opinion on whether the Prescotts' actions

constituted neglect; and (2) Wade ignored an office note from K.P.'s plastic surgeon, that

indicated he believed the Prescotts' first aid treatment was adequate. See Doc. 11, Ex. 3 (Dr.

Inciong's note).

Here, Plaintiffs' assertions fail to rebut Defendants' arguments for summary judgment for

several reasons. First, Plaintiffs' allegations against Wade are unsupported by reference to facts,

suggesting that they are merely speculative.[8] Plaintiffs attempt to support their argument with

Mrs. Prescott's affidavit, which simply states that the Prescotts informed Wade of their first-aid

training, that Wade's notes on the meeting refer to their training, and that the information about

their qualifications was not included in Wade's later reports. Mrs. Prescott Aff. Even taking the

evidence in the light most favorable to the Plaintiffs, it requires an unjustifiable inferential leap

to conclude that information about their first-aid training was "not considered" by Wade.

Plaintiffs provide no evidence of Wade's synthesis of the data she collected in her investigation,

evidence that might have been obtained by questioning Wade using available discovery devices,

---

[8] See supra, note 1.

which if even used, were not submitted to the Court for review in ruling on this Motion. Second, Plaintiffs' allegations are immaterial to the procedural due process analysis. As noted above, procedural due process requires only that individuals be given notice and an opportunity to be heard. Wolf, 555 F.3d at 323. The factual record in this case clearly indicates that the Prescotts were notified of the YPSS investigation on numerous occasions, that they participated in the investigation, and that they exercised their statutory right to be heard when they (successfully) overturned the determinations of neglect at the local conference and a subsequent state-level administrative hearing. See Wade Decl. at ¶¶ 7-13; see also Irvine Decl. at ¶¶ 5-8. Finally, Plaintiffs' objections to the manner in which the YPSS investigation was conducted are insufficient to establish a due process violation. In Wolf, the Fourth Circuit held that imperfections in an investigation do not violate due process, if the flaws do not deprive an individual of the right to make their case. Wolf, 555 F.3d at 323. Here, despite the alleged imperfections in the investigation, Plaintiffs were able to make their case—twice.

The Prescotts' successful appeal of the findings of neglect, suggests that like the Plaintiff in Wolf, the Plaintiffs were not denied the right to be heard. Wolf, 555 F.3d at 323. Because the YPSS investigation, determination, and handling of the Prescotts' appeal provided Plaintiffs with a meaningful opportunity to be heard, Plaintiffs' procedural due process rights were not violated. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on this ground.

2. Substantive Due Process

Defendants next argue that summary judgment is appropriate because Wade and Irvine's conduct did not violate the Prescotts' substantive due process rights. Doc. 7 at 12. As above, the presumed due process right is Plaintiffs' right to familial privacy and integrity.

Substantive due process protects the individual against the "exercise of power without any reasonable justification in the service of a legitimate governmental objective." County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998). When the actions of a governmental officer are at issue, the "cognizable level of executive abuse of power [is] that which shocks the conscience." Id. at 847; see also Wolf, 555 F.3d at 323.

Defendants assert that the Plaintiffs' substantive due process rights were not violated, because Wade and Irvine "both acted in accordance with their statutory and regulatory duties" under Virginia law. Doc. 7 at 14. Once a report of abuse or neglect is deemed valid, social services is required to complete and document a family assessment and investigation. See Va. Code § 63.2-1506(B)(3). In conducting that investigation, social services is required, to the extent possible, to gather all relevant information in collaboration with the family. 22 Va. Admin. Code § 40-705-70 B. Upon completion of an investigation, the social worker is required to determine whether each allegation is founded or unfounded. Va. Code § 63.2-1505(B)(5). Defendants aver that Wade's investigation, and determination, and Irvine's subsequent review of Wade's findings were conducted in a manner consistent with these (and other) requirements set forth in the Virginia Code.[9] Wade investigated the reports of neglect, despite encountering resistance from the Prescotts that she described as "unpleasant."[10] Wade Decl. ¶¶ 7, 9, 10. Before making her determination, Wade convened a team of at least six other social workers to review and discuss the evidence. Wade Decl. at ¶ 15. This meeting was more than required by Virginia regulations governing child protective services. 22 Va. Admin. Code § 40-705-110

---

[9] It is undisputed because Plaintiffs Response did not include the required statement of disputed facts, resulting in the admission of and Defendants' factual record.
[10] Indeed, Wade extended the investigation from 45 days to 60 days, so that she could compile all data needed to make her determination. Wade Decl. at ¶ 12; see also Va. Code § 63.2-1506(B)(3); 22 Va. Admin. Code § 40-705-120.

("[i]n investigations, the child protective services worker shall make a dispositional assessment after collecting and synthesizing information about the alleged abuse or neglect.").

Plaintiffs fail to rebut Defendants' substantive due process arguments. Doc. 11 at 4. Plaintiffs merely assert, "Wade failed to include relevant and exculpatory information gathered early in the investigation and the [sic] Irvine failed to notice or inform herself of these facts at any time prior to the first appeal is a matter that could legitimately "shock the conscience." Id. This assertion is problematic for several reasons. First, the statement ignores the factual and legal reality that Irvine's involvement begins **after** Wade makes her determination. Irvine Decl. at ¶ 5; Va. Code § 63.2-1526(b); see also 22 Va. Admin. Code § 40-705-120(E)(1)-(2). Second, as noted in the procedural due process analysis above, Plaintiffs do not proffer any evidence to support their allegations of misconduct by Wade. Moreover, Plaintiffs' unsupported view of the facts is inconsistent with Defendant's statement of undisputed facts (which was admitted pursuant to Local Rule 56(B)). See, e.g., Irvine Decl. at ¶ 6 (noting that the first time documented evidence that Mr. Prescott may have had some first-aid training including burn care was presented to her was at the informal conference). Had Plaintiffs' Response complied with Local Rule 56(B) this inconsistency may have created a factual dispute. However, Plaintiffs fail to support their argument with fact or law, rendering it speculative and conclusory, and unable to survive summary judgment. See Doyle, 877 F. Supp.at 1005 (observing that a nonmoving party that relies on "mere belief or conjecture, or the allegations and denials contained in his pleadings" will not survive summary judgment).

Defendants' factual record establishes that both Wade and Irvine's conduct was consistent with what was required by Virginia law. In Wolf, the Fourth Circuit held that a social worker's investigation of reports of possible harm to a child, when such conduct is consistent

with law, is not an abuse of power that "shocks the conscience." 555 F.3d at 323. In Wolf, the defendant's questioned conduct was a thorough investigation of a woman who social services was informed might hurt her child. Id. at 314-15. Here, the questioned conduct is a thorough investigation of parents whose admitted lapse in judgment resulted in actual injury to their toddler, injury that may have been compounded by their subsequent decision to delay seeking the care of a medical doctor. Where the Fourth Circuit concluded that an investigation was appropriate in light of the mere possibility of a child being harmed, surely, a fortiori, an investigation about the circumstances of a toddler's injuries is not conduct that "shocks the conscience." Id. at 323. Moreover, the Fourth Circuit observed, importantly, that imposing civil liability for standard social services investigations into child abuse would turn Virginia's child abuse reporting system and social services apparatus "on its head," an outcome the court was not willing to sanction. Id. at 323, 314. Because Plaintiffs have not proffered any evidence that Defendants' actions were sufficiently outside the bounds of a standard child abuse or neglect investigation to constitute an exercise of power so arbitrary as to "shock the conscience," Plaintiffs' argument that their substantive due process rights were violated must fail. Accordingly, the Court **GRANTS** summary judgment on these grounds.

    *iii.*    *Qualified Immunity*[11]

Alternatively, Defendants argue that Plaintiffs' constitutional claims are barred by the doctrine of qualified immunity. Doc. 7 at 15.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

[11] Judge, a footnote in Defendants' Motion notes that to the extent Plaintiffs' sue Wade and Irvine in their official capacities, such a suit is barred by the 11th Amendment's grant of immunity. In support of this view Defendants cite to a magistrate judge's report and recommendation, the text of which indicates that Eleventh Amendment sovereign immunity extends to social services agencies when employees are sued in their official capacities.

which a reasonable person would have known." Harlow, 457 U.S. at 818. Even a government

official's mistakes or errors in judgment are protected by qualified immunity. See Maciariello v.

Sumner, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray

areas; they are liable for transgressing bright lines."); see also Pearson v. Callahan, 555 U.S. 223,

231 (2009) (noting that a government official's mistakes of fact and law are protected by

qualified immunity). The Fourth Circuit has held that the doctrine of qualified immunity extends

to social services officials engaged in child abuse investigations. See Martin, 346 F.3d at 507;

see also Renn, 100 F.3d at 352.

Qualified immunity provides immunity from suit rather than a mere defense to liability.

Mitchell v. Forsyth, 472 U.S. 511, 526, (1985). Qualified immunity may be a basis for summary

judgment. Harlow, 457 U.S. at 815-16; see also Torchinsky v. Siwinski, 942 F.2d 257, 261 (4th

Cir. 1991) ("[A] particularly appropriate procedure for determining an official's entitlement to

qualified immunity is summary judgment.").

To defeat qualified immunity, a plaintiff must show that the challenged conduct violated

a constitutional or statutory right that was clearly established. Harlow, 457 U.S. at 818.

Whether a right was clearly established is an inquiry that "turns on the 'objective legal

reasonableness of the action, assessed in light of the legal rules that were clearly established at

the time it was taken." Pearson v. Callahan, 555 U.S. 223, 244 (2009) (quoting Wilson v. Layne,

526 U.S. 603, 614 (1999)).

Defendants contend that they are entitled to qualified immunity because their conduct

was objectively reasonable, as their actions were within the authority granted them by Virginia

law.[12] Doc. 7 at 15. In support of this argument, Defendants cite to Renn, where the Fourth

Circuit reversed the district court's decision to deny the defendants qualified immunity, because

---

[12] See supra p. 14 for the specifics of this argument.

the facts did not show "that defendants acted outside the authority granted to them by state statute." 100 F.3d at 349. Defendants note, as in <u>Renn</u>, their conduct was consistent with the statutory and regulatory requirements governing child protective services in Virginia. Doc. 7 at 16.

For their part, Plaintiffs reiterate their allegations that Wade failed to consider exculpatory information when making her finding, also adding that Wade "withheld important dispositive information" from individuals relying on it, like Dr. Starling. Doc. 11 at 4. Plaintiffs argue that these omissions are objectively unreasonable. <u>Id.</u> As with Plaintiffs' arguments regarding substantive and procedural due process, Plaintiffs do not set forth facts supporting their accusations that Wade either possessed or withheld exculpatory information. Moreover, review of the Starling Report suggests that any factual dispute as to whether Dr. Starling was provided information about Plaintiffs' first-aid training was immaterial, as the Report notes that the first aid treatment provided by the Prescotts was "not appropriate burn care for a burn as severe as [K.P.'s]." Starling Report at 3.

Here, Defendants are entitled to the protection of qualified immunity, and consequently, summary judgment. Defendants correctly note that qualified immunity is extended to conduct that is objectively reasonable. <u>Harlow</u>, 457 U.S. at 818. As noted in the above analysis of Plaintiffs' substantive due process claim, Defendants' factual record demonstrates that, as in <u>Renn</u>, Wade and Irvine's actions in investigating and conducting the local conference were within the bounds of the laws governing child protective services in Virginia. 100 F.3d at 352. Plaintiffs' have not set forth a single fact disputing this. Thus, Defendant's conduct was objectively reasonable. Moreover, the Court is mindful of the Fourth Circuit's observation that "the complicated balance between a parent's right to raise their children and a State's interest in

protecting its minor citizens" frequently renders the right to family integrity "amorphous," with contours that may be insufficiently clear to be "clearly established." Martin, 346 F.3d at 506. As a result of this lack of clarity, in the Fourth Circuit, "an official will not be held liable for 'bad guesses in gray areas.'" Id. (quoting Maciarello, 973 F.2d at 298). Because Plaintiffs have not proffered any evidence that Defendants' conduct was objectively unreasonable, Plaintiffs' case is barred by the doctrine of qualified immunity. Accordingly, the Court **GRANTS** summary judgment on this ground.

## B. Plaintiffs' Malicious Prosecution Claim

To sustain a cause of action for malicious prosecution, a plaintiff must demonstrate that the prosecution was: (1) malicious; (2) instituted by or with the cooperation of the defendant (3) without probable cause, and (4) terminated in a manner favorable to the plaintiff. See O'Connor v. Tice, 281 Va. 1, 7 (2011); see also Merch. v. Fairfax County, Va., 778 F. Supp. 2d 636, 650 (E.D. Va. 2011). When a malicious prosecution claim stems from a civil proceeding, the Supreme Court of Virginia imposes a fifth requirement —"the plaintiff must allege and prove arrest of her person, seizure of his property or special injury incurred." Ayyildiz v. Kidd, 220 Va. 1080, 1084 (1980).

The parties concede that the factual record establishes the second and fourth elements of Plaintiffs' malicious prosecution claim. See Doc. 7 at 20; Doc. 11 at 4-5. It is indisputable that in investigating reports of child neglect, Defendant Wade instituted a "prosecution" against Plaintiffs. Wade Decl. at ¶ 14. It is also clear that the prosecution was terminated in a manner favorable to the Prescotts, as ultimately both findings of neglect were overturned on appeal. See Irvine Decl. at ¶¶ 7-8. Thus, the question before the Court is whether the Plaintiffs have proffered evidence that: (1) Wade's investigation was malicious; (2) instituted without probable

19

cause; and (3) resulted in the arrest of the Prescotts, the seizure of their property, or special injury.[13]

### i. *Malice*

"In the context of a malicious prosecution action, malice is defined as any *controlling* motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime, or see that the guilty are punished." Hudson v. Lanier, 255 Va. 330, 333 (1998). In a malicious prosecution action, the malice inquiry focuses on the defendant's motivations, rather than the guilt or innocence of the plaintiff. Page v. Wilson, 168 Va. 447, 454, (1937).

Defendants contend that Plaintiffs have failed to show any evidence that the YPSS investigation was motivated by malice. Doc. 7 at 24-27; doc. 12 at 10. This is because, according to Defendants, Wade and Irvine's actions associated with the YPSS investigation were "compelled by Virginia law and performed with a good faith desire to enforce [Virginia law]." Doc. 7 at 24. In support of this contention, Defendants cite extensively to sections of the Virginia Annotated Code and Virginia Administrative Code governing child protective services. See, e.g., 22 Va. Admin. Code § 40-705-50(B) (requiring that social services determine the validity of referrals or complaints of child abuse); 22 Va. Admin. Code § 40-705-50(H) (requiring completion of a family assessment and investigation in cases involving neglect resulting in serious injury); see also Va. Code § 18.2-371.1 (defining "serious injury" to include a severe burn or laceration). Virginia law sets forth specific requirements for the conduct of a child abuse or child neglect investigation and the resultant assessment. See, e.g., 22 Va. Admin. Code § 40-705-80(A)(1)-(3) (requiring face to face interviews with the alleged victim, victim's siblings, and the alleged victim's parents, guardian, or caretaker); 22 Va. Admin. Code § 40-705-

---

[13] During the hearing, Plaintiffs abandoned all state claims against Defendant Irvine.

80(B)(2) (requiring such interviews and observations to be electronically recorded); 22 Va. Admin. Code § 40-705-70(A) (requiring investigators to seek first-source information about the allegations, including police reports, depositions, photos, medical records, and electronic recordings of interviews); 22 Va. Admin. Code § 40-705-110(A) (requiring investigator to conduct an initial assessment and develop a safety plan). These regulations are but a few of a complicated regulatory scheme that compels certain conduct from child protective services investigators. See, 22 Va. Admin. Code § 40-705 (governing child protective services). Wade's declaration indicates that she conducted the investigation in the manner outlined by regulations governing children protective services. See Wade Decl. at ¶¶ 3, 6 7, 8, 12, 14, 15 (describing the referral to YPSS, Wade's information collection efforts, and her analysis of the records). Indeed, Wade's declaration indicates that when her motives were questioned by the Prescotts, she made it clear that she was conducting the investigation as she would conduct any other. Id. at 10.

For their part, Plaintiffs simply assert that by "repeatedly refusing to consider all exculpatory information" and "ignoring and not communicating important information" during the course of the YPSS investigation, Wade placed herself outside the requirements of Virginia law, and thus demonstrated malice. Doc. 11 at 5. Plaintiffs do not support this assertion with either law or evidence of Wade's alleged misconduct. As such, their argument is without merit.

Here, the evidence suggests that Wade's investigation was motivated by her legal obligation to resolve a report of child neglect made by a mandatory reporter at LAFB. Wade communicated these motivations to the Prescotts, and proceeded with her investigation and dispositional assessment as required by Virginia law. See 22 Va. Admin. Code § 40-705-50(H). Plaintiffs set forth no evidence demonstrating that Wade's conduct was outside of what was required of her by law, nor any evidence of bad faith on Wade's part. Thus, Plaintiffs fail to

support their argument that Defendant Wade's YPSS investigation was motivated by malice. Hudson, 255 Va. at 333. As malice is an essential element of a claim for malicious prosecution, Defendants are entitled to summary judgment as a matter of law. However, Plaintiffs also failed to proffer any evidence establishing a lack of probable cause, which is discussed at length below.

### ii. *Probable Cause*

In the context of a malicious prosecution action, probable cause is defined as "knowledge of such a state of facts and circumstances as excite the belief in a reasonable mind, acting on such facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." Reilly v. Shepherd, 273 Va. 728, 733 (2007). The existence of probable cause is determined based on the facts and circumstances known to the defendant at the time of the complained of action. Id.[14]

### 1. Medical Neglect

Defendants set forth the following facts in support of their argument that the Wade had probable cause to support the medical neglect determination:

Wade was assigned the Prescotts' case after K.P. was brought into LAFB urgent care with a large second-degree burn from her shin. Wade Decl. at ¶ 3. Wade obtained LAFB medical records, where she learned that K.P. was injured on June 7, 2009, and brought in to urgent care by Mrs. Prescott on June 8, 2009, after she awoke from a nap feeling warm. Id. at ¶ 6. K.P.'s treating doctor at LAFB, Dr. Koertner noted that K.P. had suffered a second-degree burn, and that he found it worrisome that she had a delay in treatment. Id. Dr. Koertner also indicated he thought the burn required specialized care, and referred K.P. to Dr. Inciong at APS.

---

[14] Because the parties' arguments in the briefs and at the hearing focus on probable cause as associated with the investigation and subsequent determination of Level 2 Medical Neglect, the Court focuses on whether there was probable cause to sufficient to support investigating the Prescotts for commission of Level 2 Medical Neglect. The Court FINDS, however, that the factual record supports a finding of Probable Cause for the Physical Neglect charges against Mr. Prescott as well.

Id. He also thought it appropriate to contact CPS. Doc. 7, Ex. 3 (LAFB Urgent Care Physician Record).[15] After reviewing the medical records, Wade contacted the Prescotts, eventually scheduling an in-home visit. Id. at 7. During the in-home visit, held on June 19, 2009, Wade learned the circumstances of K.P.'s injury, and that the Prescotts observed that skin had pulled away from K.P.'s leg immediately after she was injured. Id. at 8. She learned that Mrs. Prescott rinsed K.P.'s leg with water, applied triple antibiotic, and gave her some Tylenol. Id.; see also Mrs. Prescott Dep. 15:4-22. Wade personally observed what looked like a severe burn that was approximately 10 by 5 centimeters in size. Wade Decl. at ¶ 8.

Wade requested a forensic pediatric consultation from Dr. Starling, the Medical Director of the Child Abuse Program at a hospital in Norfolk, Virginia. Id. at ¶ 14. The Starling Report concluded that Mrs. Prescott's efforts to care for K.P.'s wound the day of the incident did not constitute appropriate care for a burn as severe as the one she had suffered, and that this, combined with a nearly twenty-four (24) hour delay in obtaining medical care, showed a lack of parental judgment and constituted neglect. Id.

Defendants contend that the above facts establish that Wade was reasonable to suspect that the Prescotts had committed medical neglect, defined in Virginia as occurring "when there is the failure by the caretaker to obtain or follow through with a complete regimen of medical . . . care for a condition which if untreated could result in illness . . . ." 22 Va. Admin. Code § 40-705-30. A level two finding includes "those injuries/conditions real and threatened, that results

<hr>

[15] This Court notes that LAFB staff also thought it appropriate to reach out to the Poquoson Police Department ("PPD"). Doc. 7, Ex. 5 at ¶ 3 (Declaration of Sergeant Kelly Waddell) (hereinafter, "Waddell Decl."). After completing his initial investigation on June 8, 2009, Sergeant Waddell referred the case to a detective with the PPD for further investigation. Id. at ¶ 7. After reviewing the results of Waddell's investigation, and completing her own investigation, Detective Lisa Turner decided to charge the Prescotts with failing to seek medical attention for an injured child, in violation of Section 18.2-314 of the Virginia Code. Doc. 7, Ex. 6 at ¶ 5. (Declaration of Lisa Turner) (hereinafter, "Turner Decl.").

in or were likely to have resulted in moderate harm to a child." 22 Va. Admin. Code § 40-700-20.

In Plaintiffs' view, the best evidence of the absence of probable cause is the fact that Irvine overturned Wade's determination of medical neglect at the local conference, after Plaintiffs presented evidence that a doctor found the Prescotts' care of their daughter was appropriate and Mr. Prescott had military training in first aid. Doc. 11 at 5. Plaintiffs argue that Wade unjustifiably withheld information that "undermined her claim of probable cause" in her risk assessment, findings, and in discussions with Dr. Starling, so that she could unfairly conclude that the Prescotts had committed medical neglect. Id.

Even taken in the light most favorable to Plaintiffs, Plaintiffs' arguments are undermined by the undisputed facts of this case. The factual record in this case indicates that the Prescotts **verbally** informed Wade of their first aid training at the June 19, 2009 home visit. See Doc. 11, Ex. 5 (YPSS narrative of electronic recording of the initial home visit). Irvine indicates she overturned the finding of medical neglect because she received, **for the first** time, documentation indicating that Mr. Prescott had received first aid training and may have had knowledge of burn care. Irvine Decl. at ¶ 6. This suggests Irvine's decision to overturn was influenced not by the Prescotts' assertions that they were first-aid certified, but by the receipt of proof that Plaintiffs' qualifications existed and were applicable to K.P.'s injury. Additionally, Plaintiffs have not proffered evidence that Wade received Dr. Inciong's office note on July 16, 2009, a fact that is also irrelevant, as Irvine's decision relied on a letter from K.P.'s pediatrician, Dr. Charlotte Moore. Id.

Plaintiffs' argument is also legally defective. Here, Plaintiffs rely on Irvine's post-investigation assessment of the case to argue that at the time Wade began her investigation she

lacked probable cause. However, the Virginia Supreme Court has explicitly held that acquittal is not evidence of a lack of probable cause. See Page v. Wilson, 168 Va. 447, 453-54 (1937). This is because the acquittal may have been a technicality, or simply because in the end, the evidence didn't rise to the level required for conviction, a higher standard than is required for a finding of probable cause. Id. Thus, Plaintiffs incorrectly rely on the fact that Irvine overturned the initial finding. Plaintiffs' reliance on evidence introduced to Irvine post-investigation is similarly flawed. In Virginia, the determination of whether probable cause existed is based on the facts and circumstances known to the defendant at the time of the complained of action. Reilly, 273 Va. at 733. To demonstrate a lack of probable cause in this instance, Plaintiffs' arguments must focus on the facts and circumstances known to Wade between June 8, 2009 and August 5, 2009. Wade Decl. at ¶¶ 3, 16 (noting the beginning and end of the YPSS investigation). Instead, Plaintiffs focus on evidence that was provided to Irvine, for the first time, on January 5, 2010. See Irvine Decl. at ¶ 6. Plaintiffs simply cannot bring the evidence presented to Irvine within the appropriate scope of a probable cause inquiry.

By contrast, the facts presented by Defendants establish that there was reason to investigate whether the Prescotts had committed medical neglect. At least two physicians, Dr. Koertner, and Dr. Starling, were concerned by the delay in treating K.P.'s injury, which is sufficient for Wade to reasonably suspect that the Prescotts were guilty of level 2 medical neglect. Moreover, the circumstances of K.P.'s injury were sufficient to lead to two independent PPD investigations, and ultimately criminal charges of medical neglect. See Turner Decl. at ¶ 5.

Thus, the Court **FINDS** that Wade had probable cause to investigate the Prescotts for both medical and physical neglect.

Additionally and alternatively, Defendants argue that Plaintiffs have failed to allege that

Wade's investigation resulted in the Plaintiffs' arrest, seizure of their property, or special injury.

Doc. 7 at 27. In the Complaint, the Plaintiffs' allege the following damages:

> the Plaintiffs have been greatly injured in that their credit and
> reputation has been brought into public disrepute among the
> member [sic] of their community; has been hindered in the practice
> of their profession; has been required to spend substantial time
> away from their business and to expend substantial sums of money
> to defend against these wholly frivolous charges; has been cause
> much anxiety and mental anguish; and has been made the object of
> public scorn ridicule and humiliation. Compl. at ¶ 17.

Plainly, there are no allegations of arrest or seizure of property as a result of Wade's

investigation contained in the Complaint. Thus, the question becomes whether Plaintiffs have

alleged and can prove that they have suffered a special injury. Ayyildiz, 220 Va. at 1084.

"The 'special injury' restriction requires allegation and proof of a special loss or unusual

hardship resulting from the malicious prosecution of the original action[.]" Ayyildiz, 220 Va. at

1084. The restriction focuses on the intention of the defendant in prosecuting the original case,

instead of the special circumstances of the plaintiff. Id. Thus, the special injury restriction

excludes "the kind of secondary consequences that are a common and often unavoidable burden

on defendants in 'all similar causes[.]'" Id. (internal citation omitted). In short, "the malicious

prosecution 'must be attended, besides ordinary expenses, with other special grievance or

damage, not necessarily incident to a defense, but superadded to it by the malice and contrivance

of the plaintiff.'" Id. (quoting Potts v. Imlay, 4 N.J.L. 377, 382, 385 (1816)).

In the Response, for the first time, Plaintiffs allege the nature of the injuries suffered as a

result of the YPSS investigation. Doc. 11 at 7. Plaintiffs contend that Mr. Prescott was removed

from an executive officer position aboard a submarine tender, a break in his career that forced

him into early retirement and precipitated the Prescotts relocation to Florida. Id. However, the Plaintiffs' own factual record does not support their contentions. Transcripts of Mr. Prescott's deposition, provided by Plaintiffs, reveal that Mr. Prescott was never actually employed as an executive officer on a submarine, but rather, believes he did not receive a promotion he was "penciled in to receive." Mr. Prescott Dep. 84:9-21. He also admits that he has no evidence of the veracity of his belief, and confesses that he was not forced to retire. Id. at 85:1, 11; see also id. at 85:19, 20.[16]

Assuming arguendo, that there are facts to support the Plaintiffs' allegations of injury, the Plaintiffs' circumstances do not constitute a "special injury" as defined by Virginia law. In Ayyildiz, the Virginia Supreme Court held that loss of reputation, attorney's fees, and the loss of present and future income do not qualify as special injuries, because such consequences are faced by most individuals forced to defend themselves. Ayyildiz, 220 Va. at 1084-85. Plaintiffs complain that they have lost their reputations, opportunities for career advancement, and significant money defending themselves against the YPSS neglect investigation. Compl. at ¶ 17, Doc. 1. Here, as in Ayyildiz, Plaintiffs' alleged injuries are "the kind of secondary consequences that are a common and often unavoidable burden on defendants in 'all similar causes[.]'" Because Plaintiffs cannot marshal any evidence of a special injury, they are missing an essential element of their state claim, and Defendants are entitled to summary judgment. Accordingly, the Court **GRANTS** summary judgment on the grounds that Plaintiffs have not proffered any evidence of three essential elements of their state law claim, i.e. the presence of malice, the absence of probable cause, and the presence of a special injury.

---

[16] Plaintiffs recently attempted to introduce the testimony of two naval officers to assist in establishing the above referenced facts. Their proposed testimony is the subject of Defendants' Motion in Limine, which is rendered moot by the Court's decision to grant Defendant's Motion for Summary Judgment.

*iv.* *Good Faith Immunity*

Finally, Defendants contend that they are entitled to good faith immunity. In support of this argument, Defendants cite to a number of Virginia Supreme Court cases holding that public officials that performed their duties in good faith were immune from civil liability. See, e.g., Dechene v. Smallwood, 226 Va. 475 (1984), 480-81; Harlow v. Clatterbuck, 230 Va. 490 (1986). Defendants allege, as above, that Wade and Irvine's actions were required by law, and thus, in good faith.[17]

Plaintiffs' rebuttal references qualified immunity, but appears to be an attempt to discuss good faith immunity. Doc. 11 at 5 ("Wade did not act in good faith when ignoring and not communicating important information during the course of her investigation."). The argument, however, is inadequate, because Plaintiffs provide no evidence that Wade omitted important information from her investigation, or failed to consider such information when making her determination.

Here, it is not clear that a doctrine of good faith immunity exists in Virginia, and if it did, that such doctrine extends to the actions of social services workers involved in child abuse/neglect investigations. Defendants cited cases do not specifically identify a doctrine of good faith immunity, indeed, Clatterbuck, seems to create a doctrine of quasi-judicial immunity. Clatterbuck, 230 Va. at 496. Additionally, Defendants' cited cases involve police officers and correctional officers, not social workers. While the roles of police and correctional officers may be analogous to Wade's role in the investigation, there is no direct authority indicating that the doctrine of good faith immunity extends to social workers involved in child abuse and neglect investigations. It is unnecessary, however, to decide whether Defendants are entitled to good faith immunity, because as noted above, Plaintiffs failed to proffer evidence supporting three

---

[17] See supra pp. 21-22.

essential elements of their state law claim, malice, probable cause, and special injury.

Accordingly, Plaintiffs' state law claim must fail as a matter of law.

## V.    CONCLUSION

For the aforementioned reasons, the Court **GRANTS** Defendants' Motion for Summary

Judgment, disposing of Plaintiffs' Federal and State Law Claims, because Defendants are

entitled to judgment as a matter of law. Additionally, the Court **DENIES** Defendant's Motion in

Limine as **MOOT**.


It is so **ORDERED**.

/s/
Henry Coke Morgan, **Jr.**
Senior United States District Judge
*HENRY COKE MORGAN, JR.*
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
Date: April ___, 2013